# In the District Court of the United States
## For the District of South Carolina
### BEAUFORT DIVISION

| | | |
|---|---|---|
| Victoria E. Smith, | ) | Civil Action No.  9:06-0185-CWH-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Beaufort County School District, | ) | **OF THE MAGISTRATE JUDGE** |
| Superintendent Herman Gaither, in | ) | |
| his individual and official capacities, | ) | |
| Principal Daniel Durbin, in his | ) | |
| individual and official capacities, | ) | |
| Assistant Principal William Cottrill, | ) | |
| in his individual and official capacities, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## I.    INTRODUCTION

The Plaintiff, Victoria E. Smith ("Plaintiff" or "Smith"), filed this civil rights action

pursuant to 42 U.S.C. § 1983, alleging retaliation in violation of the First Amendment against the

Defendants Beaufort County School District (the "District") and Superintendent Herman Gaither

("Gaither"), Principal Daniel Durbin ("Durbin"),[1] and Assistant Principal William Cottrill

("Cottrill"),[2] each in their individual and official capacities.  Plaintiff also alleges a state law

cause of action solely against the District for wrongful termination in violation of public policy.

Plaintiff requests a jury trial, and seeks the award of actual, consequential, and compensatory

damages, punitive damages against Gaither, Durbin and Cottrill in their individual capacities

---

[1]    Durbin was the Principal of Beaufort High School during the time of the incidents alleged in Plaintiff's Complaint.

[2]    Cottrill was the Assistant Principal for Special Needs at Beaufort High School during the time of the alleged incidents giving rise to this action.  Plaintiff's Exhibit 3, attached to Plaintiff's motion for summary judgment at Bates Stamp # 53 (subsequent references to Plaintiff's exhibits will be noted in an abbreviated fashion as "Exhibit ___, Bates ___.").

only, attorneys' fees and costs as available under Section 1983, and any other damages and remedies as deemed appropriate by the court.  [1-2]

This action originally was filed in the Beaufort County Court of Common Pleas on December 15, 2005 and was timely removed by the Defendants.  [1]  The Defendants subsequently responded to the Plaintiff's allegations and now seek summary judgment as to all of Plaintiff's claims.  [34]  This Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331 as the Plaintiff's complaint raises issues of federal law, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper because the events at issue occurred in this District and Division.  28 U.S.C. § 1391.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B), and Local Rule 73.02(B)(2)(g), D.S.C., the undersigned United States Magistrate Judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 2000e, *et seq*. and submit findings and recommendations to the District Court.

## II.  FACTS

Plaintiff has a Masters in Special Education and is certified in trainable mental disabilities ("TMD").  From 2002 to 2005, the Plaintiff worked as a special education teacher for TMD students at Beaufort High School under Principal Durbin.  William Cottrill, Assistant Principal of Beaufort High School, headed the Special Needs education program at Beaufort High School and was the Plaintiff's direct supervisor.[3]

Plaintiff first began having issues with her employment in 2003.  In May 2003, Plaintiff told Cottrill of several problems with other staff and teachers in the Special Education

---

[3]        Complaint, paragraph 3; Affidavit of William Cottrill [34-3] at paragraph 1.

Department.[4]  Cottrill addressed a memorandum to the Plaintiff on May 27, 2003 stating that the

Plaintiff's complaints were unfounded.[5]  Plaintiff contends that "issues with the staff and faculty

continued but were not addressed."[6]  At Cottrill's direction, Plaintiff attempted on several

occasions to correct the behavior of her assistants by providing them with detailed schedules and

memoranda regarding the time to come in and what to do throughout the day.[7]  Plaintiff contends

she also made complaints verbally and in writing regarding about her perceived mistreatment of

students and conflicts with personnel.  Plaintiff contends that her complaints were not

addressed.[8]  The Defendants contend that in response to each complaint received, one of the

Plaintiff's supervisors investigated the matter complained of and responded appropriately.[9]

On July 23, 2003, Plaintiff sent a memorandum to Cottrill asking for a second teaching

assistant to assist with the teaching and care of her students.[10]  In July 2003, Cottrill met with

Plaintiff to discuss the TMD class and the assistants provided to her.[11]  Plaintiff was told that her

---

[4]     Plaintiff's counsel sets forth the following:  Plaintiff told Mr. Cottrill that another teacher had stolen her documentation book, that the teachers and assistants next door to her did not do anything, that she did not receive any support from administration to attempt to solve the issues with her assistants, that Ms. Heyward, another assistant, had called her a heifer, that another teacher, Ms. Tchou, locked the bathroom door, and that there were assistants doing their personal laundry in the classroom.  Plaintiff's counsel refers to Exhibits 25 and Exhibit 27 to Plaintiff's motion in opposition to summary judgment, but the Court is unable to find any documents within that reference which support these allegations.

[5]     The Court is unable to locate this document in Plaintiff's pleadings.

[6]     Plaintiff's Fact # 17.

[7]     Plaintiff's Exhibit 9, Bates 203, Exhibit 10, Bates 205, Exhibit 23 Bates 281 to 283.

[8]     Exhibit 10, Bates Stamp 206.

[9]     Affidavit of William Cottrill, paragraphs 3 – 4.

[10]    Exhibit 3, Bates 95.

[11]    Plaintiff's Fact # 21.

goals could be met with one assistant.[12]

It appears that on or about September 12, 2003, the Plaintiff raised a number of concerns to Cottrill; he responded with a lengthy memo to Plaintiff which stated: "your concerns have been noted and taken seriously."[13]  On September 17, 2003, the Plaintiff complained about Ms. Alice Tchou's treatment of a student[14] and Plaintiff also again stated that she needed two assistants in order to properly teach and care for her students.[15]  On December 10, 2003 the Plaintiff complained to Cottrill about her teaching assistant, Ms. Hattie Green.[16]  Also on December 10, Cottrill sent an email to the Special Education Department, informing them that they were a good department and that they needed to get along better among themselves.[17]  On December 12, 2003, Cottrill met with Ms. Green to discuss her performance issues.[18]  On December 19, 2003 the Plaintiff received an email from Cottrill asking Plaintiff for documentation to support her complaints about Ms. Green; Cottrill told Plaintiff that when he had talked to Ms. Green, she had not been aware of the Plaintiff's issues with her performance and instructed Plaintiff (as Green's direct supervisor) to talk to Green.

On April 26, 2004, Cottrill called Plaintiff to his office to discuss her certification, because the State's Accreditation Report indicated that she was not properly certified to teach

---

[12]     Exhibit 3, Bates 94.

[13]     Exhibit 3, Bates 85.

[14]     Ms. Tchou taught Severely and Profoundly disabled students.  Her classroom was opposite the Plaintiff's classroom.  Deposition of Victoria Smith, [33-3] at p. 83, l. 8-14.

[15]     Exhibit 3, Bates 81, 83.

[16]     Plaintiff's Fact #33.  The Court cannot find any documentation to support this Fact.

[17]     Exhibit 3, part 2, Bates 76.

[18]     Exhibit 3, Bates 74-75.

TMD at that time.  By memo, Cottrill suggested she contact several people regarding the TMD certification and he stated he too would contact several people about the situation.[19]

On August 20, 2004, the Plaintiff sent an email to Cynthia Hayes regarding a conversation she had had with Durbin, whom she claimed was "extremely disrespectful and mentioned person issues that had nothing to do with the subject matter."[20]  Plaintiff stated that if Durbin could not apologize for his behavior she wanted to file a grievance.[21]  Ms. Hayes told Plaintiff that Plaintiff needed to talk to Human Resources regarding a grievance.[22]

Plaintiff filed the first of two formal grievances with the Beaufort County School Board on August 25, 2004.  Plaintiff's first grievance was filed in response to a memorandum that one of the Plaintiff's superiors, Dr. Walter Hawk, II, wanted to place in her personnel file.[23]  Plaintiff believed that Dr. Hawk was insinuating that she had removed information regarding a former student from that student's file.[24]  Plaintiff's grievance stated:

> A memorandum has been placed in my personnel file which is vaguely written and suggest[s] misconduct.
>
> **[Facts:]**  A visiting student came to my classroom.  He received a visitor's pass form the front desk.  Mr. Hawk and Mr. Johnson expressed concern about the student.  The student's file was kept in the TMD drawer along with all the former students.  There is no information that suggested the concerns expressed.  . . . I asked questions about where other than the student file would relevant info[rmation] be found.  My supervisor directed me to talk to the principal.  The principal did not respond favorably.  He suggested in response that an investigation was ongoing to determin[e] if the files had been tampered with.  I asked my immediate supervisor if I was under

---

[19]     Exhibit 3, Bates 70.

[20]     Exhibit 6, Bates 174.  The "subject matter" of the conversation is not known to the Court.

[21]     Exhibit 6, Bates 174.

[22]     Exhibit 6, Bates 176.

[23]     Affidavit of Daniel Durbin, Exhibit A.

[24]     Plaintiff's Fact # 46.

investigation via e-mailed [sic].  Mr. Cottrill assured me I was not.[25]

Significantly, Plaintiff claimed in her grievance that a memorandum <u>had</u> been placed in her personnel file.[26]  In response to the first grievance, the District scheduled a meeting for August 26, 2004.  Before the meeting was held, the Plaintiff learned that the memorandum at issue <u>had not</u> been placed in her personnel file and informed the District that she did not want to go forward with the grievance.  The District believed the issue to be resolved.[27]  Later, however, Plaintiff complained to Cottrill that a letter which had implicated her in wrongdoing had been made part of her record, she had filed a grievance to have the memo removed from her personnel file, and she had not received any response from Mr. Hawk regarding the substance of those complaints.[28]  On September 9, 2004, Plaintiff contends she asked Mr. Cottrill for an update on the grievance.[29]  On September 10, 2004 the Plaintiff sent Mr. Cottrill an email to address the District's policy regarding grievances and asked that the grievance move forward as outlined in that policy.[30]

On November 12, 2004 Plaintiff e-mailed Cottrill regarding additional problems with her assistant, Ms. Green.[31]  On November 13, 2004 the Plaintiff met with Cottrill regarding her

---

[25]     *See* Exhibit A to Affidavit of Durbin at Doc. No. 7037.B.0367 and 7037.B.0368.

[26]     Exhibit 16, Bates 229.

[27]     Affidavit of Durbin [34-4] at ¶ 9.

[28]     Plaintiff's Facts 47-48; *see also* Exhibit 1, page 20, Exhibit 3, 110 and 119.

[29]     Exhibit 6, Bates 177.

[30]     Exhibit 3, Bates 113 *and* Exhibit 6, Bates 177.

[31]     Exhibit 3, part 4, 122.

problems with Ms. Green.[32] On December 14, 2004 the Plaintiff told Cottrill and Mona Lise Dickson of her issues with staff member Mr. Keith Alston (Ms. Tchou's assistant), whom she thought had an inappropriate relationship with her student (Bruce) because of Mr. Alston's continued instigation of bad behaviors, which caused Bruce to leave the classroom to see Mr. Alston.  The Plaintiff also complained that Mr. Alston was disrespectful towards her in front of her students and other teachers.  Plaintiff told Cottrill that she had discussed this issue with Ms. Tchou, who failed to respond.[33]

On January 5, 2005, Durbin informed Plaintiff by letter that Mr. Keith Alston had filed a job harassment complaint against the Plaintiff after Plaintiff's husband threatened Alston at his home following a verbal argument Alston had with the Plaintiff.[34]  The complaint was forwarded to the District's personnel office.  Durbin instructed Plaintiff not to have direct or indirect contact with Mr. Alston.[35]  Plaintiff recalls that Cottrill told her that Mr. Alston had been told not to have any direct or indirect contact with Plaintiff or her students.[36]

On January 7, 2005, Plaintiff reviewed her personnel file but did not see any reference to Mr. Alston's complaint claiming job harassment.  Cottrill informed Plaintiff that the matter had been resolved.[37]

---

[32]   Exhibit 3, part 4, 122.

[33]   Exhibit 3, Bates 128 and Exhibit 3, Bates 72.

[34]   Affidavit of Durbin, ¶¶ 7 – 8 ; and Exhibit B, Doc. No. 7037.AA.0020; and Doc. Nos. 7037.AB.0989 – 90.

[35]   Exhibit 33, Bates 334.

[36]   Exhibit 3, Bates 69.

[37]   Exhibit 1, Bates 17.

On January 10, 2005, Plaintiff met with Otis Smith, the District's Assistant

Superintendent of Human Resources ("Smith")[38] to discuss the following issues:

(1) Durbin's January 5, 2005 letter to Plaintiff stating that Keith Alston had filed a job harassment complaint against her; Plaintiff told Smith about the many confrontations she had had with Alston;

(2) the mistreatment directed at Plaintiff by administrators and staff at Beaufort High School; Plaintiff had been told there was a huge file being maintained on her, and that her August 24, 2004 grievance had not been responded to;

(3) Plaintiff's concerns that her problems with administrators and staff of Beaufort High School caused problems for Plaintiff's daughter, who was a student at the high school;

(4) Plaintiff's request for information in the files of the Beaufort Police Department and Officer Richardson;

(5) Plaintiff mentioned her excellent evaluations and wanted to know the reason she was not appreciated and why she was being singled out by the principal.  It was agreed that Plaintiff would re-submit the grievance she had filed on August 24, 2004.[39]

On January 18, 2005, Plaintiff e-mailed Smith with a list of specific concerns that she

wanted Smith to address as soon as possible:  (1) regarding her husband not being allowed to

enter the Beaufort High School campus where their daughter attended school; (2) seeking a copy

of the complaint filed against her by Mr. Alston; (3) and seeking a copy of the original grievance

she had filed in August.[40]  On January 18, 2005 Smith gave Plaintiff a copy of the January 5,

2005 letter from Keith Alston, wherein Alston accused her of harassment.[41]  Smith also informed

Plaintiff that he had not received her original grievance from August.[42]  On January 20, 2005,

Plaintiff told Cottrill via e-mail that she did not believe one of her students (Michael) was

receiving a fair and appropriate education; Cottrill responded by stating that Michael had work

---

[38]    Exhibit 1, Bates 9.

[39]    Exhibit 1, Bates 18.

[40]    Exhibit 1, Bates 15.

[41]    Alston's letter is attached as Exhibit 33, Bates 333.

[42]    Exhibit 1, Bates 16.

to do and that Credit Recovery was designed to help students like Michael catch up and graduate.[43]   On January 21, 2005 the Plaintiff sent an email to Cottrill explaining the reasons she was mentoring Michael, and told Cottrill that Michael wanted a High School Diploma instead of a certificate.[44]

During the course of her employment, and in addition to the complaints set forth by the Plaintiff in her Complaint, the Plaintiff made numerous complaints regarding personal difficulties with various co-workers.  Plaintiff admits to having difficulties with Ms. Tchou, Hilary Savarese, Herman Glaze, Walter Hawk and Mona Lise Dickson of Beaufort High School administration, and Rose Heyward, Keith Alston, Hattie Green and Ms. Seabrook, all of whom were teaching assistants in the Special Education department.[45]  The District investigated each of the Plaintiff's personnel complaints and found that they involved personality conflicts or personal issues that did not relate to the education of students.  Not one of the Plaintiff's complaints resulted in a finding of misconduct.[46]

A number of employees also complained about the Plaintiff's conduct, claiming that she was confrontational and disrespectful to them.  Alice Tchou became so frustrated with the Plaintiff's constant accusations against her that she kept a handwritten notebook documenting her contact with the Plaintiff.  Hattie Green threatened to quit her teaching assistant position because of constant conflicts with the Plaintiff.  And, as mentioned above, Keith Alston filed a

---

[43]        Exhibit 3, Bates 67.

[44]        Exhibit 3, Bates 67 (second page of 67).

[45]        *Id.*, p. 49 – 53.

[46]        Affidavit of William Cottrill, ¶ 3.

formal harassment complaint against the Plaintiff.[47]

Because Plaintiff's conflicts with coworkers continued, on January 31, 2005, Cottrill sent a letter to the Plaintiff informing her that these conflicts were not acceptable.  Cottrill notified the Plaintiff that her failure to improve her working relationships would result in a recommendation that her employment contract not be renewed for the following school year.[48]

On January 31, 2005 the Plaintiff e-mailed Smith regarding a request that she meet to answer questions concerning Mr. Alston's complaint.  Plaintiff told Smith that she was having problems understanding Mr. Alston's complaint and wanted her attorney to be present at the meeting.[49]

On February 2, 2005, Cottrill, Plaintiff, and Mona Lise Dickson met to discuss Cottrill's concerns with Plaintiff.[50]  Cottrill told Plaintiff that her failure to successfully work in collaboration with others was interfering with her teaching duties and the successful implementation of the students Individual Education Plans ("IEPs").  Cottrill also told Plaintiff that he would conduct monthly reviews of the Plaintiff's performance for the remainder of the school year.[51]  Cottrill recalls that during the meeting, the Plaintiff avoided eye contact with him and knitted and appeared to ignore him.  Cottrill recalls that Plaintiff denied responsibility for any of the personnel conflicts and refused to participate in any conversation regarding the issues

---

[47]    *Id.*, paragraphs 7 – 8 and Doc. Nos. 7037.AB.0989 – 90.

[48]    *Id.*

[49]    Exhibit 1, Bates 114.

[50]    Affidavit of William Cottrill, ¶¶ 7 – 8 and Doc. Nos. 7037.AB.0989 – 90.

[51]    *Id.* and Doc. No. 7037.AA.0206.

raised.[52]  Plaintiff claims she was "bullied, humiliated and threatened" by Cottrill and Ms.

Dickson in a manner which she felt was harassment[53]  and accused her superiors of deliberately

harassing her.[54]  At the conclusion of the meeting, Cottrill attempted to deliver a written letter[55]

detailing the District's concerns with her performance, but the Plaintiff refused it.  Ms. Dickson

advised the Plaintiff that refusing the letter would be considered insubordination.  Plaintiff then

accepted the letter, stood, and held her chest, and said she felt faint and was having chest pains.

Cottrill called the front office and asked for the school nurse and for personnel to call 911.  The

school nurse arrived and checked the Plaintiff's blood pressure and found it normal.  EMS

arrived and again checked the Plaintiff's pressure.  When again it read normal, Cottrill recalls

that Plaintiff stood up and said she was fine, refused any further treatment and walked out of the

office.  Plaintiff alleges she was advised to go home.  Plaintiff's room was locked so she walked

through Ms. Tchou's room;[56] Plaintiff alleges that Ms. Tchou kicked the Plaintiff and her

students out of her class and made nasty statements to the Plaintiff.[57]  Plaintiff reported this

incident to Cottrill.[58]

The next day, on February 3, 2005, Plaintiff filed her second and final grievance, alleging

that she was bullied, humiliated and threatened by Cottrill and Mona Lise Dickson during their

---

[52]      *Id.*, Doc. Nos. 7037.AB.0989 – 90.

[53]      Plaintiff's Exhibit 1 Bates 60.

[54]      *Id.*, Doc. Nos. 7037.AB.0989 – 90.

[55]      *Id.*, Doc. No. 7037.AA.0206.

[56]      Exhibit 1, Bates 60.

[57]      Exhibit 1, Bates 12.

[58]      Exhibit 1, Bates 12.

February 2, 2005 meeting.[59]  Also on February 3, Plaintiff asked Ms. Tchou to limit the number

of visits from Ms. Tchou's staff during instructional time because it distracted her students.[60]

On February 4, 2005, Cottrill stopped at Plaintiff's classroom at 7:15 a.m. but no one was

present; Ms. Tchou had Plaintiff's students because no one had been available to get Plaintiff's

students off the bus.  By e-mail, Cottrill reminded Plaintiff that all teachers were expected to be

at school by 7:15. a.m.[61]  Plaintiff replied by e-mail, stating that her assistant, Ms. Green was to

arrive at 7:15 a.m., and Plaintiff took her teacher preparation time in the mornings and signed in

between 7:30 and 7:45 a.m.[62]  Cottrill responded by telling Plaintiff that she was expected to be

at school on time at 7:15.[63]  Plaintiff responded by telling Cottrill that he was saying that she

could no longer have her prep period in the morning, and asked to be assigned a prep period so

she would not have to change it again.[64]  Also on February 4, Cottrill instructed Plaintiff and Ms

Tchou to develop a plan to share the washing machine used by the Special Needs department and

provide him with a copy of that plan or schedule.[65]

On February 8, 2005, following several e-mails between Cottrill and Plaintiff, Cottrill

wrote:

> This is my last email regarding these complaints.  I hear your complaints.  My suggestion is that if
> you're unhappy at Beaufort High School, you should look for another place to teach.  My

---

[59]    Id., Exhibit A; Deposition of Daniel Durbin, Exhibits 7 and 8.

[60]    Exhibit 33, Bates 335.

[61]    Exhibit 3, Bates 50.

[62]    Exhibit 3, Bates 49.

[63]    Exhibit 3, Bates 49.

[64]    Exhibit 3, Bates 49.

[65]    Exhibit 3, Bates 52-53.

expectations are the same for ALL teachers . . . Come to work, do your job and work with others. If you cannot do these things then this may not be the place for you.  I am growing weary of the constant accusations and the constant twisting of the truth.  The environment that is being created has made it impossible for our students to be successful . . . .

As many times as I have investigated Ms. Tchou and your accusations, I have <u>never</u> found any evidence that warrants she has mistreated any of your students.  As a matter of fact, Ms. Tchou and Ms. Heyward have helped with your students on numerous occasions when you have been absent.  (Emphasis in original).

I do not care when you take your planning.  Make sure that your students are supervised appropriately and that you are actually planning during that time. . . . [66]

Also on February 8, 2005, Plaintiff met with Smith and Robyn Decker, Human Resources Manager, to discuss Plaintiff's two grievances filed on January 25, 2005 and February 3, 2005. Smith told Plaintiff that he needed to know the administrative procedure, rules and regulations that Plaintiff deemed had been violated, misapplied, or misinterpreted.  Plaintiff said she would provide Smith with that information the next day, on February 9, 2005.  Smith said he would not forward or process the grievances until Plaintiff provided that information, and after he received the information, Smith would forward the grievances to Durbin, who would set up a meeting and hear her grievances and respond to her in writing.[67]

On February 11, Plaintiff met with Smith and Ms. Ruby Stradford Johnson.  Cottrill did not attend that meeting.  Plaintiff was informed that her specific complaints as well as the letter that Cottrill had written were located in the Human Resources Office.  The Plaintiff went to Human Resources office and at that time neither of the items were in the Human Resources office.  Plaintiff told Human Resources that she wanted to set up another meeting with Cottrill to discuss the content of her complaints regarding student safety, protocols for IEP's and ethical and legal protocols for the use of a handicapped bathroom, which non-handicapped students

---

[66]     Exhibit 3, Bates 45.

[67]     Exhibit 1, Bates 9.

were using.[68]

On February 12, 2005, Plaintiff e-mailed Smith and Ms. Stradford Johnson regarding the previous day's meeting and stated that the same student whom she reported had been tied to a door of Ms. Tchou's classroom the year before was still being tied to the door. Plaintiff felt that tying a student to a door was harsh treatment. Plaintiff also informed Smith and Ms. Stradford Johnson that Mr. Alston had brought in a large turkey fryer at Christmas time and placed it in a traffic area, near the student who was tied to the door.[69]

On February 14, 2005, Cottrill asked Plaintiff to meet with him and Ms. Stradford Johnson the next day.[70] Plaintiff refused, stating that she would not meet with him until he had "defined the behavior that you feel needs changing or until I have copies of both corrective actions and the file that supports your report."[71]

On February 15, 2005, Cottrill sent Plaintiff a letter to follow up on the February 2, 2005 conference and his January 31, 2005 letter. He stated:

> My initial judgment was that I would monitor your progress on a monthly basis. However, your behavior over the last week indicates that you are continuing to engage in behavior, which adversely affects our ability to serve our students. Therefore, I am going to monitor your progress on a weekly basis.
>
> As you may recall, on February 2, 2005, you indicated that Ms. Alice Tchou had mistreated you and your students by throwing all of you out of her room. You also indicated that Ms. Alice Tchou said some nasty things to you. However, after taking statements from witnesses, I found no indication that your report was valid.[72]

On February 21, 2005, Plaintiff e-mailed Smith to "follow-up to both phone

---

[68]    Exhibit 1, Bates 7.

[69]    Exhibit 1, Bates 7.

[70]    Exhibit 3, Bates 44.

[71]    Exhibit 3, Bates 42.

[72]    Exhibit 3, Bates 41.

conversations and multiple e-mail [sic] to request an opportunity to view materials that relate to corrective actions and files that has [sic] been used to discredit my work.  I am unable to respond to my supervisor or to defend myself without viewing the materials which you have in your possession."[73]  Plaintiff also asked whether a determination had been made regarding Alston's charge of job harassment made against her and asked to view the statement given by Robyn Decker regarding that matter.[74]

On February 22, 2005, Smith responded to Plaintiff's e-mail by e-mail, and also sent a letter to Plaintiff at her home, stating he had received her e-mail of February 21, 2005 and that she had been given access to her personnel file and reviewed it a number of times.  Smith refused to make the information he had collected in his investigations available to Plaintiff and informed her that the investigation into Alston's job harassment claim against her was ongoing.[75]

On February 25, 2005, Mr. Cottrill held a meeting with Plaintiff, Ms. Tchou, and Mrs. Savarese in an attempt to facilitate communication and cooperation between Plaintiff and Ms. Tchou and to discuss ways that Plaintiff's TMD classroom could collaborate and communicate with Ms. Tchou's Severe and Profoundly disabled class.  The laundry issue was discussed and a laundry schedule was agreed upon.  The issue of when a particular child would be picked up for lunch was discussed and a plan was agreed upon.  Plaintiff and Tchou were instructed to plan together during the week, and meet again with Cottrill on March 4.[76]

------

[73]     Exhibit 1, Bates 4.

[74]     Exhibit 1, Bates 4.

[75]     Exhibit 1, Bates 6.

[76]     Exhibit 3, Bates 40; Affidavit of William Cottrill, Doc. No. 7037 AA .0210.

On February 28, 2005, Cottrill memorialized the discussion of the February 25 meeting and reminded everyone of the March 4 meeting.[77]  The Plaintiff failed to attend the March 4, 2005 meeting.[78]

On March 7, Plaintiff e-mailed Smith and copied Durbin, stating that she wanted to move forward with her grievance.  She asked about the progress made in resolving Alston's complaint against her.  Plaintiff also asked to view her personnel file on March 9.[79]

On March 17, 2005, Plaintiff attended a meeting with Cottrill and Savarese to discuss teaching assistants and other concerns.[80]  Cottrill scheduled the next meeting for March 22, but Plaintiff failed to attend or notify the others of her absence.[81]

The Plaintiff's continued conflicts and refusal to work with others led to Cottrill's recommendation that the Plaintiff's contract not be renewed for the following year.  On April 12, 2005 Cottrill sent a Certified Letter to Plaintiff's home to provide Plaintiff with formal notice that he was recommending that her employment with the District not be continued beyond the conclusion of the 2004-25 school year.  He stated:

> As you may recall, over the last year, you have had several conflicts with other faculty and staff members who also serve our special education students.  Your pattern of continuous conflicts with others caused me to write you on January 31, 2005, explaining the problem, offering assistance with correcting the problem, asking that you meet with me on a periodic basis to discuss your progress, and warning that failure to improve may result in a termination recommendation.
>
> After reviewing your behavior over the last few months, I do not believe that you wanted to improve your working relationships with others.  You continue to resist meeting with me as your

---

[77]     Exhibit 3, Bates 40;

[78]     Affidavit of Cottrill, Doc. No. 7037 AA .0210.

[79]     Exhibit 3, Bates 39.

[80]     Exhibit 3, Bates 37.

[81]     Exhibit 3, Bates 36; Affidavit of Cottrill, Doc. No. 7037 AA .0213.

assistant principal, and you continue to have conflicts with other employees.  Your behavior in this regard, severely hampers your effectiveness as a special education teacher at Beaufort High School.

As explained during our numerous conferences, our special education students require a team approach for service.  Each member of the team must be willing to work well with other members for the good of each student.  You have strongly resisted our efforts in this regard, and therefore, we believe that the termination of your employment is appropriate under the circumstances.  While we regret this action is necessary, we believe it is in the best interest of our students.[82]

On April 12, 2005, based on Cottrill's assessment of Plaintiff, Durbin recommended to Gaither and the School Board that the Plaintiff's employment contract not be renewed for the 2004-05 school year due to a pattern of continuous conflicts with other faculty and staff in the special education program.[83]  Later on April 12, the School Board voted not to renew the Plaintiff's contract for the 2005-06 school year.[84]

On April 13, 2005, Gaither sent a Certified Letter to Plaintiff at her home to advise her that the School Board had voted at its regular meeting on April 12 to accept Gaither's recommendation that her employment with the District not be continued beyond the conclusion of the 2004-05 school year.[85]  Gaither stated:

The decision is based on your continuous conflicts with other employees, which interfere with Beaufort High School's ability to serve all of its special education students.  By letter dated January 31, 2005, [Cottrill], your Assistant Principal, advised you of concerns and explained the possible consequences if you failed to show improvement.  Not only did your performance not improve, but you resisted meeting with Mr. Cottrill to discuss ways in which you could improve.  Your repeated conflicts with others and your wilful refusal to follow the directives of your supervisors, justifies the non-renewal of your employment under the provisions of S.C. Code Ann. §§ 59-25-430 and 440.

Under S.C. Code Ann. § 59-25-470, you have a right to a hearing before the Beaufort County Board of Education, provided you make a written request for the hearing within fifteen (15) days of

---

[82]     Exhibit 3, Bates 35; Cottrill Doc. No. 7037.B.0025.

[83]     Affidavit of Durbin [34-4] at ¶ 12; Deposition of Durbin, Exhibits 1 and 6.

[84]     Affidavit of Durbin [34-4] at ¶ 13.

[85]     Affidavit of Durbin [34-4], Exhibit B, Doc. No. 7307.B.0027.

your receipt of this letter. ...[86]

On April 14, 2005, pursuant to her rights under S.C. Code § 59-25-470, the Plaintiff e-mailed Gaither to request a hearing before the Beaufort County Board of Education.  She also requested a meeting with Superintendent to discuss the lack of information available in her personnel file.  Plaintiff also stated that on February 21, 2005, when she had reviewed her personnel file, it did not contain anything that could lead to dismissal.  She told Gaither that she could not respond to Gaither's allegations until she knew on what they were based.  She informed Gaither that Smith had told her by letter dated March 31, 2005:  "[T]here is no derogatory information in your personnel file.  As for the communications between you and the administrators of the school, opinions are being expressed.  Expressed opinions are not grievable."  Plaintiff asked Gaither to withdraw his request for her dismissal "ASAP".[87]

Before the hearing was held, the Board withdrew its prior decision and on June 8, 2005 offered the Plaintiff a contract for the 2005-2006 school year.[88]  In the June 8, 2005 letter, the District expressed its concern regarding the Plaintiff's continued conflicts with coworkers.  The District planned to provide a new supervisor for the Plaintiff for the 2005-06 school year and an improvement plan for the Plaintiff.[89]  The June 8 letter which accompanied the proposed contract specifically informed Plaintiff that her failure to sign and deliver the contract to the District office by June 21, 2005 would constitute a rejection of the District's offer of employment.[90]  The

---

[86]     Exhibit 2, Bates 32.

[87]     Exhibit 2, Bates 30-31.

[88]     Affidavit of Durbin, ¶ 14, Attachment B, Doc. No. 7037.B.0028.

[89]     Affidavit of Durbin [34-4] at ¶ 14 and Exhibit B thereto, Doc. No. 7037.B.0028.

[90]     Affidavit of Durbin [34-4] at ¶ 14 and Exhibit B thereto, Doc. No. 7037.B.0028.

Plaintiff failed to sign and return the offered contract by the required date, thereby rejecting the District's offer of employment for the 2005-06 school year.[91]

Because the Plaintiff was offered a contract, the Board's attorney wrote Plaintiff on June 9, 2005 to inform her that the hearing regarding her non-renewal had been cancelled.[92]

Meanwhile, on May 5, 2005, Plaintiff filed a complaint with the South Carolina Human Affairs commission.[93]  On August 1, 2005, after the Plaintiff's rejection of the 2005-2006 contract, the Plaintiff filed a charge of discrimination with the EEOC, bearing charge number 14C-2005-02666, alleging discriminatory conditions within the District including discrimination against the Plaintiff and special education students.  The EEOC issued a right to sue letter on March 30, 2006.[94]  Prior to the issuance of the right to sue letter, the Plaintiff filed this suit in the Beaufort County Court of Common Pleas on December 15, 2005, alleging retaliation and wrongful termination.

---

[91]     Deposition of Victoria Smith, April 13, 2007, p. 13., l. 1-21 and Doc. No. 7037.AB.0675; Affidavit of Durbin [34-4], Exhibit B, Doc. No. 7037.AB.0675.

[92]      Durbin Affidavit Attachment B, Doc. No. 7037.B.0112.

[93]     Plaintiff's Exhibit 6, Bates 180.

[94]     Deposition of Victoria Smith, April 13, 2007, p. 13., l. 1-21.

## IV.     SUMMARY JUDGMENT STANDARD

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id., quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).  The Defendants, as the moving parties, bear the initial burden of pointing to the absence of a genuine issue of material fact.  *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the Defendants carry this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  *Id.* at 718-19, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial."  *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

defeat a motion for summary judgment. *Id. and Doyle v. Sentry Inc.*, 877 F.Supp. 1002, 1005 (E.D.Va. 1995). Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra*. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *and DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954 (4th Cir. 1996). In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## V.    ANALYSIS

The Plaintiff alleges that the Defendants recommended that her employment not be renewed for the 2005-2006 school year in retaliation for the exercise of her right to free speech under the First Amendment of the United States Constitution.[95] The Plaintiff contends that her complaints to the administration of Beaufort High School constitute a constitutionally protected

---

[95]    Complaint, paragraphs 23 and 30.

activity and also is mandated by S.C. Code § 20-7-510.[96]  According to the Plaintiff's Complaint,

she engaged in constitutionally protected speech by making the following complaints to her

superiors at Beaufort High School:[97]

> a. A special education child was tethered to a door;

> b. The Plaintiff's assistants failed to perform their job duties;

> c. A turkey fryer was placed near a doorway to her classroom;

> d. African-American students in the learning disabled program received disparate treatment;

> e. A student was forced out of the program despite failing to meet graduation requirements;

> f. The school allowed former students to visit and commingle with special needs students;

> g. The administration mismanaged an investigation of allegations against a special education student;

> h. The school failed to update student files;

> i. Restrooms were not properly maintained;

> j. The school failed to address the medical needs of a physically handicapped child; and

> k. The school failed to provide proper speech services to students.

Regarding the complaints referenced in the Plaintiff's Complaint, the District has

responded as follows:

> a. The student tethered to a doorway suffers from extreme physical and mental deficiencies and posed an extreme risk of harm to himself and others due to his special needs.  Tethering the child was included in the student's individual education plan and was done with the parent's knowledge and permission.[98]

> b. The District observed the Plaintiff's classroom and attempted to mediate between the Plaintiff and her assistants, encouraging the Plaintiff to provide assistants with clear, written expectations

---

[96]     As the Defendants correctly point out, Plaintiff refers to S.C. Code Ann. § 20-70-510 in her Complaint, but no such section exists.  The Defendants and this Court presume that Plaintiff intended to refer to S.C. Code § 20-7-510, the mandated reporter section of the Children's Code and the Plaintiff's claims will be addressed under that section.

[97]     Complaint, paragraphs 9 – 11.

[98]     Affidavit of Daniel Durbin, paragraph 6; Deposition of Daniel Durbin, p. 14, l. 22 – p. 15, l.

of their performance.[99]

c. The turkey fryer was not in use and no student desks were located near it.  Furthermore, the Plaintiff's classroom had other doorways which offered unencumbered access to her classroom.[100]

d. The Plaintiff did not complain to the District that African-American students in the special education program received disparate treatment.  She made this claim in her EEOC complaint filed after she declined the position offered for the 2005-2006 school year.[101]

e. The Plaintiff complained to the administration regarding the treatment of a regular student.  The Plaintiff believed that the student was being inappropriately forced out of the school despite not having completed the courses necessary for graduation.  The administration informed the Plaintiff that the student was not allowed on school property due to a pending criminal investigation and allegations of sexual assault.[102]

f. The Plaintiff complained about the school's visitation policy being unclear after the District instructed her not to permit a particular former student to visit her classroom due to allegations that he sexually assaulted another student while enrolled at Beaufort High School.[103]

g. The Plaintiff complained that the District mismanaged the investigation regarding the visiting student referenced above after she was accused of removing materials from his school file.[104]

h. The Plaintiff complained about the District's maintenance of files in response to the accusation that she removed materials from a student's files.  In response, the District moved the former student files to a locked filing cabinet.[105]

i. The Plaintiff complained that another special education teacher improperly disposed of soiled diapers.  The District found that the diapers had been placed in a trash can and encouraged the Plaintiff to discuss these issues with the other teacher.[106]

j. The District is not aware of any complaints made by the Plaintiff concerning the medical needs of students other than one incident where the Plaintiff argued with a physical therapist regarding

---

[99]    Affidavit of William Cottrill, paragraph 9 and Doc. No. 7037.AA.0056.

[100]    Deposition of Victoria Smith, October 30, 2006, p. 187 – 188.

[101]    Affidavit of Daniel Durbin, paragraph 10.

[102]    Affidavit of William Cottrill, Doc. No. 7037.AB.0843 – 0844; Deposition of Victoria Smith, October 30, 2006, p. 166 – 168.

[103]    Affidavit of Daniel Durbin, paragraphs 8 – 9 and Exhibit A; Deposition of Plaintiff, October 30, 2006, p. 104 – 112.

[104]    *Id.*

[105]    *Id.*

[106]    Affidavit of William Cottrill, Doc. No. 7037.AB.0838; Deposition of Victoria Smith, October 30, 2006, p. 82, l. 1 – 83, l. 6.

the use of a piece of medical/therapeutic equipment, a gait trainer, to assist with one of her students.[107]

k. The District is not aware of any complaints of the Plaintiff regarding speech services for students.[108]

## A.  Plaintiff's First Amendment retaliation claim

The Plaintiff alleges that she exercised her First Amendment rights by making complaints to the administration of Beaufort High School and that in retaliation for this speech, the District and the individually named Defendants retaliated against her by improperly handling her complaints, placing false information in her personnel file and offering her a conditional employment contract.  The Plaintiff contends that the conduct of the Defendants amounts to an unlawful employment action.

It is well-settled that "a State may not discharge an employee on a basis that infringes that employee's constitutionally protect interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383 (1987).  In order to succeed on this First Amendment claim, the Plaintiff must demonstrate that (1) she spoke as a citizen about matters of public concern; (2) her interest in exercising free speech is not outweighed by the countervailing interest of the state in providing the public service that she as a teacher was hired to provide; and (3) her speech played a substantial role or was a motivating factor in the adverse employment action.  *Stroman v. Colleton County Sch. Dist.*, 981 F. 2d 152, 156 (4th Cir. 1992).  For the reasons discussed below, the Court is of the opinion that Plaintiff's claim fails as a matter of law.

## 1.  The Plaintiff's complaints were made pursuant to her duties as a teacher

---

[107]     Affidavit of William Cottrill, Doc. No. 7037.AB.0837; Deposition of Victoria Smith, October 30, 2006, p. 78, l. 5 – p. 80, l. 5.

[108]     Affidavit of Daniel Durbin, ¶ 10.

**and are not protected by the First Amendment.**

The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City Of Elizabeth City*, 388 F. 3d 440, 446 (4th Cir. 2004). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton County Sch. Dist.*, 981 F. 2d 152, 156 (4th Cir. 1992). Furthermore, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, – U.S. –. 126 S. Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). On the other hand, "when an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." *Id*. at 1961.

The *Garcetti* decision is particularly instructive to this case. In *Garcetti*, Ceballos, a deputy district attorney with the Los Angeles County District Attorney's Office, held the supervisory position of calendar deputy. At the request of defense counsel, Ceballos reviewed a case pending in his office and found what he believed to be serious misrepresentations in an affidavit used to secure a search warrant in the particular case. Ceballos brought his concerns to his supervisors, prepared two memoranda regarding the same and recommended dismissal of the

criminal case.  Despite Ceballos's recommendation, the Office proceeded with the prosecution.

At some point, the defense made a motion to traverse the warrant and called Ceballos as a

witness in the motion hearing.  The motion was denied.  In the aftermath of these events,

Ceballos claims he was subjected to retaliatory acts including reassignment from the calendar

deputy position, transfer to another courthouse and denial of a promotion.  *Garcetti*, 126 S.Ct. at

1955-56.

The Supreme Court held that the Constitution does not insulate public employees from

employer discipline for statements made pursuant to their official duties, as such speech is not

protected by the First Amendment.  Statements, whether verbal or in writing, which are made

pursuant to official duties, are not made as citizens for First Amendment purposes.  Ceballos

spoke as a prosecutor fulfilling a responsibility to advise superiors about pending cases.

"Restricting speech that owes its existence to a public employee's professional responsibilities

does not infringe any liberties the employee might have enjoyed as a private citizen.  *Id*. at 1960.

Simply put, "the First Amendment does not prohibit managerial discipline based on an

employee's expressions made pursuant to official responsibilities."  *Id*.

In the present case, Plaintiff asserts that the alleged retaliatory acts of the Defendants

were based on her complaints regarding other personnel and the treatment of students in the

special education program.  All of the Plaintiff's complaints were made to the administration of

Beaufort High School.  According to the Plaintiff, it is a part of her duties as a teacher to report

her concerns to the administration.[109]  None of her complaints fell outside of this duty to report.

Moreover, none of the Plaintiff's complaints concerned the possible abuse or neglect of any

---

[109]     Plaintiff's Deposition, October 30, 2006 p. 234, l. 19–p. 236, l. 11.

student, a concern which the Plaintiff would have been compelled to report to the South Carolina Department of Social Services under S.C. Code § 20-7-510. Instead, as the record abundantly reflects, Plaintiff complained about her coworkers, working environment and the treatment of students as, in her own words, an advocate of students. While education concerns and the treatment of students could be held to be matters of public concern, the Plaintiff did not speak as a citizen. She spoke as an employee to her supervisors pursuant to her role as a teacher. The Plaintiff's speech is not protected by the First Amendment, and her claim of unconstitutional retaliation must fail.

## 2. The Defendant's interest in providing educational services to special needs students outweighs any interest the Plaintiff has in making the subject complaints.

Even assuming that the Plaintiff's complaints regarding her concern for students fall outside of her duties as a teacher, the court must look to whatever public interest may be contained in the subject speech and weigh it against the state's dual interest as a provider of public service and employer of persons hired to provide that service. *Stroman*, 981 F.2d at 158. This determination is a question of law. *Hall v. Marion School District No. 2*, 31 F.3d 183, 194 (1994). The balancing of interests focuses on the disruption or potential disruption of government services because of the speech. *Connick v. Myers*, 461 U.S. 138, 151 (1983). Importantly, the Fourth Circuit has noted that "it is clear that school districts must have wide latitude to run schools and to terminate teachers whose actions hinder the education of children." *Hall*, 31 F.3d at 195.

In balancing the interests of the state against that of a public employee, courts look to the extent the employee's speech disrupts the state's operation and mission which, in this instance, is

the operation of Beaufort High School and the education of the Special Needs students.  Factors

relevant to this inquiry include whether the Plaintiff's complaints (1) impaired the maintenance

of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close

personal relationships; (4) impeded the performance of the Plaintiff's duties; (5) interfered with

the operation of the school; (6) undermined the mission of the school; (7) was communicated to

the public or to coworkers in private; (8) conflicted with the responsibilities of the Plaintiff

within the school; and (9) abused the authority and public accountability that the plaintiff's role

entailed.  *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 317 (2006).

According to Cottrill, who supervised the Special Education department, Special Education

teachers were to operate as a team.[110]  The individual educational goals and plans for students are

outlined in the students' individual education plans or IEPs, which are constructed with the input

of teachers, parents, administrators and others with the goal of providing proper educational

services to a student in the least restrictive environment appropriate for the student's needs.

Many times, this calls for students to be transferred between the two levels of special education

classes and into regular classes at various intervals during a school day.  Because of these

transfers, it is imperative that the special education teachers and assistants work together to

coordinate schedules to properly transfer the students and provide continuous instruction.

Equally important is the sharing of resources and equipment between the classes to ensure the

maximum benefit to students.[111]

       The Defendants argue that as a result of the Plaintiff's continuous complaints of

---

[110]     Affidavit of Cottrill [34-3] at ¶ 2.

[111]     Affidavit of Cottrill [34-3] at ¶ 2.

personnel difficulties and challenges regarding her coworker's teaching methods, the education

of Beaufort High School's Special Needs students suffered.  The Plaintiff interrupted the other

special education classroom to confront Ms. Tchou with her complaints.  The Plaintiff has both

refused to accept students from and returned students to Ms. Tchou's class despite their IEPs

calling for them to be in the Plaintiff's class.  The Plaintiff failed to keep proper attendance

records, failed to attend a mandatory IEP meeting and refused to attend planning meetings with

Ms. Tchou.  Plaintiff also failed to coordinate with her coworkers to ensure that her students

were properly supervised, leading to a female student appearing topless and a male assaulting

another student in the school cafeteria.[112]

Plaintiff's complaints hindered communication between her and the remainder of the

Special Education personnel, such as Ms. Tchou.  Because of the Plaintiff's refusal to cooperate

and coordinate with her coworkers, students were at times unsupervised or refused the provisions

outlined in their IEPs.  Each of the factors outlined above weighs in the Defendants' favor.  The

District's interest in ensuring for the education and well-being of its special education students

far outweighs any interest the Plaintiff has in complaining about her coworkers, challenging

others teaching methods or filing grievances related to alleged bullying by her superiors.

## B. The Plaintiff fails to allege actionable retaliatory conduct
## of any of the individual Defendants.

The Plaintiff alleges that, due to her complaints, each of the individual Defendants took

retaliatory action against her.[113]  Plaintiff alleges that Cottrill retaliated against her in not

---

[112]    Affidavit of Cottrill [34-3] at ¶¶ 4, 10; see also Incident Timeline attached to Cottrill Affidavit at Doc. Nos. 7037 AB .0837–0844.

[113]    Complaint, paragraphs 26 – 32.

handling her personnel issues properly and in doctoring the Plaintiff's personnel files to show cause for her termination.[114]  Plaintiff claims that Durbin retaliated against her by ignoring or dismissing a grievance filed by the Plaintiff, barring the Plaintiff's husband from the school grounds and placing false information in the Plaintiff's personnel file.[115]  Plaintiff further alleges that Durbin and Gaither ignored or dismissed her grievances in retaliation for her complaints.[116]  Plaintiff also alleges that Cottrill and Durbin placed false information in her personnel file to support the recommendation that her contract not be renewed.[117]  Plaintiff claims that Gaither retaliated against her by supporting the actions of Durbin and Cottrill and in bungling the Plaintiff's complaints so that she was denied a hearing.[118]

First, Defendants contend that no false documentation exists in the Plaintiff's personnel file.[119]  Second, the Defendants contend that Plaintiff's grievances were properly handled.  As mentioned above, with respect to the first grievance Plaintiff filed on August 24, 2004, the District scheduled a meeting for August 26, 2004 to discuss that grievance.  Before the meeting was held, the Plaintiff learned that the memorandum at issue had not been placed in her personnel file and informed the District that she did not want to go forward with the grievance. The District believed the issue to be resolved.[120]  In response to the second grievance, Dr. Otis

---

[114]    Deposition of Victoria Smith, April 13, 2007, p. 64 – 66.

[115]    *Id.*, p. 23 – 24 and 30 – 32.

[116]    Deposition of Victoria Smith, April 13, 2007, p. 24, l. 8 – 9.

[117]    Deposition of Victoria Smith, April 13, 2007, page 31, l.8.

[118]    *Id.*, p. 17, l. 15 – p. 19, l. 10.

[119]    Affidavit of Daniel Durbin, Exhibit B, Doc. No. 7037.AB.0314.

[120]    Affidavit of Durbin [34-4] at ¶ 9.

Smith, Assistant Superintendent of Human Resources, met with the Plaintiff on February 8, 2005 and again on March 21, 2005.  These meetings addressed the second grievance as well as the Plaintiff's contention that the first grievance was not resolved.  Dr. Smith concluded that the alleged harassing behavior of Cottrill and Mona Lisa Dickson were simply statements of their opinions which were not grieve able.  Dr. Smith also reviewed the Plaintiff's personnel file and informed the Plaintiff that it contained no derogatory information.[121]  It appears from the record that neither Durbin, Gaither, or Dr. Smith ignored or dismissed the Plaintiff's grievances.

Even construing the facts as alleged by Plaintiff in the light most favorable to her, the Court concludes that the Plaintiff has failed to state a cause of action for retaliatory conduct against Cottrill, Durbin or Gaither because none of their actions involved employment decisions. In retaliation claims, a public employer violates an employee's First Amendment rights when it discharges, refuses to rehire, or makes decisions relating to the promotion, transfer, recall and hiring based on the exercise of the employee's free speech rights.  *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 316 (4th Cir. 2006).  Criticism, false accusations, verbal reprimands and the like are not actionable retaliatory acts.  *See Suarez Corp. Industries v. McGraw,* 202 F.3d 676, 686 (2000) (citing *Benningfield v. City of Houston,* 157 F.3d 369, 376-77 (5th Cir. 1998) and *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir. 1997)).  The Plaintiff's retaliation claims against the individual Defendants should be dismissed.

### C.  Gaither, Durbin and Cottrill are entitled to qualified immunity.

The Court also finds that Gaither, Durbin, and Cottrill are entitled to qualified immunity.

---

[121]    Deposition of Daniel Durbin, Exhibits 7 and 8; Affidavit of Daniel Durbin, Exhibit B, Doc. No. 7037.AB.0314.

To avoid excessive disruption of government, the United States Supreme Court has recognized a qualified immunity which protects "government officials performing discretionary functions from civil damage suits 'insofar as [the officials] conduct does not violate clearly established rights of which a reasonable person would have known.'" *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Reliance on the objective reasonableness of an official's conduct is measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. at 818. The degree of knowledge of the law imputed to government officials is that imputable to a reasonable official. Accordingly, "all but the plainly incompetent or those who knowingly violate the law" are protected. *Malley v. Briggs*, 475 U.S. 335 (1986). An official's entitlement to qualified immunity is based upon an "objective reasonableness" standard. "The very idea of reasonableness requires that courts accord interpretive latitude to official judgments." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992).

In determining whether an individual defendant is entitled to qualified immunity, the Court will follow the two-step sequential analysis set forth in *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court first must determine "whether a constitutional right would have been violated on the facts alleged." *Saucier*, 533 U.S. at 200. If the facts, viewed in a light most favorable to the plaintiff, do not establish a constitutional violation, the inquiry ends and the plaintiff cannot prevail. *Parrish v. Cleveland*, 372 F.3d 294,

301 (4th Cir. 2004). If, however, "the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003).

Without question, public employers may not take retaliatory action against employees for exercising their First Amendment rights. However, at this stage, the determination of whether a given right was clearly established requires that the right be defined "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Assuming that the Plaintiff's speech is subject to First Amendment protections, the question remains whether a reasonable person would have known that the Plaintiff's numerous complaints, which appear to the Court to have focused overwhelmingly on personnel issues and personality conflicts, touched on a matter of public concern and were made as a citizen, not pursuant to her duties as a teacher.

The Fourth Circuit's recent decision in *Campbell v. Galloway*, 483 F.3d 258 (4th Cir. 2007) is particularly instructive to the case at hand.[122] In *Campbell*, a female police officer with the town of Southern Pines, North Carolina, was terminated after writing a thirteen page memorandum addressing her complaints about the workplace; thereafter she brought a First Amendment retaliation claim against the town and various supervisory officers. *Campbell*, 483 F.3d at 263. Most of the complaints set forth in her memo focused on perceived slights, such as not being invited to breakfast with other officers, but the memo also set forth multiple incidents of sexual harassment. The sexual harassment allegations were investigated and handled appropriately by the city. Thereafter, Campbell received an evaluation which rated her

---

[122]    Judge Traxler wrote the opinion in which Chief Judge Wilkins and Judge Gregory joined.

performance as needing improvement.  In response, Campbell filed a grievance challenging the evaluation and an EEOC charge alleging discrimination and retaliation.  Following these filings, Campbell was involved in a search for a suspect where she stayed in her patrol car instead of joining in the foot chase of the suspect.  This incident, as well as two prior incidents where her supervisor believed that Campbell failed to back up other officers, led to her dismissal. Campbell contended that she was fired in retaliation for making complaints, including complaining of sexual harassment.

The Fourth Circuit found, in looking at Campbell's speech as a whole, that it arguably touched on a matter of public concern but that it was not established that such speech was entitled to First Amendment protections.[123]  Campbell's speech "focused overwhelmingly on personal grievances and vague gripes about fellow officers" but also contained matters of public concern (the allegations of sexual harassment).  The court found that Campbell's speech "falls within the gray area between speech that clearly is a matter of public concerns and speech that clearly is not a matter of public concern."  *Campbell*, 483 F.3d at 271.  The defendants were entitled to qualified immunity under these circumstances as their conduct cannot be said to have violated a clearly established constitutional right.  The question of the protection to be given to Campbell's speech was a close one for the Fourth Circuit.  The Court held:

> Because the facts of this case are close enough to the ill-defined line between private speech and speech involving matters of public concern, we cannot hold the defendants responsible for their reasonable but incorrect guess about how the law would apply to the facts of this case.  *See Saucier*, 533 U.S. at 205, 121 S.Ct. 2151 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. . . . If the officer's mistake as to what the law requires is

---

[123]    The Fourth Circuit did not address the impact of *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006) to Campbell's claims because the defendants in *Campbell* did not contend that Campbell's speech was made pursuant to her employment duties.

reasonable, however, the officer is entitled to the immunity defense.").

*Campbell*, 483 F.3d at 271-272.

Applying the reasoning of *Campbell* to the present facts, the Court finds that Plaintiff's claims fail to demonstrate a violation of any clearly established constitutional right. As in *Campbell*, the Plaintiff's speech overwhelmingly focused on personal grievances. Assuming that any of Plaintiff's speech was made outside her official duties as a teacher, the only subjects which could be construed as touching on matters of public concern are those regarding students, and even those complaints were intertwined with the Plaintiff's complaints about the way her coworkers handled their classrooms. At best, the Plaintiff's complaints fall into the gray area identified in *Campbell*. Indeed, it does not appear that the Plaintiff can identify a single action of any Defendant which violates a clearly established constitutional right. Qualified immunity protects governmental officials from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). The court does not believe that any "bright lines" were crossed by these Defendants in light of existing United State Supreme Court and Fourth Circuit authority. Therefore, the Defendants are entitled to qualified immunity.

### D.  Plaintiff's Claim for Wrongful Termination Under South Carolina law.

Where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises. *Ludwick v. This Minute of Carolina, Inc*., 287 S.C. 219, 337 S.E.2d 213 (1985). The Plaintiff alleges that she was constructively discharged from her employment in violation of the public policy of South Carolina and S.C. Code §20-7-510, which mandates school teachers report the abuse and neglect

of minors to the South Carolina Department of Social Services or law enforcement agency.

Plaintiff relies on S.C. Code § 20-7-510 as the basis of the "clear mandate of public policy"

which she alleges the Defendants violated.  However, there is absolutely no evidence before the

Court that the Plaintiff ever reported allegations of abuse or neglect to the South Carolina

Department of Social Services or any law enforcement agency.  Plaintiff's reliance on Section

20-7-510 is misplaced.

In order to state a claim of constructive discharge, a plaintiff must show that the

employer deliberately made working conditions intolerable in an effort to induce the employee

to quit. *Heiko v. Columbo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (applying

South Carolina law).  "Mere dissatisfaction with work assignments, a feeling of being unfairly

criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a

reasonable person to resign."  *Id*.  The Plaintiff cannot point to any deliberate actions of the

District or the individual Defendants or any objectively intolerable working condition to support

her claim of constructive discharge.  In fact, the District offered the Plaintiff a teaching position

in a different school in an effort to appease her many complaints and change her working

environment.  The Plaintiff now seeks recovery for her refusal of this offer.

Plaintiff further claims that the teaching contract offered to her for the 2005 – 2006

school year contained conditions which the District attempted to place on her in retaliation for

her complaints about the welfare of students and conduct of staff.[124]  However, it does not appear

to the Court that the District offered her a conditional employment contract for the 2005-2006

---

[124]     Complaint, paragraph 14.

school year in retaliation for her complaints.[125]  Indeed, the contract offered for 2005-2006

contained no conditional terms.  The District informed the Plaintiff in a cover letter to that

contract that she would be placed under an improvement plan the following year due to the

administration's continued concerns regarding the Plaintiff's involvement in numerous conflicts

with other employees.[126]  Plaintiff admitted that the District was permitted to implement

improvement plans for any teacher.  Plaintiff also admitted in her deposition that the

improvement plan did not exist at the time the contract was offered and, even if it had existed, it

would not have altered the proffered terms of employment.[127]

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the **Defendants' Motion**

**for Summary Judgment [34] should be granted.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

January 23, 2008
Charleston, South Carolina

---

[125]    Complaint, paragraph 14.

[126]    Affidavit of Daniel Durbin, Exhibit B, Doc. No. 7037.B.0028.

[127]    Deposition of Victoria Smith, April 13, 2007, p.13, l. 1 – 21.