**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| Victoria E. Smith, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 9:06-0185-CWH |
| | ) | |
| vs. | ) | |
| | ) | |
| Beaufort County School District, | ) | |
| Superintendent Herman Gaither, in | ) | **ORDER** |
| his individual and official capacities, | ) | |
| Principal Daniel Durbin, in his | ) | |
| individual and official capacities, | ) | |
| Assistant Principal William Cottrill, | ) | |
| in his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Victoria E. Smith (the "plaintiff" or "Smith") filed this civil rights action pursuant to 42

U.S.C. § 1983, alleging retaliation in violation of the First Amendment against the defendant

Beaufort County School District (the "District") and the defendants Superintendent Herman

Gaither ("Gaither"), Principal Daniel Durbin ("Durbin"),[1] and Assistant Principal William

Cottrill ("Cottrill"),[2] each in their individual and official capacities.  Smith also alleges a state

law wrongful termination claim against the District.

I.      Plaintiff's Allegations and Procedural History

_____

[1] Durbin was the principal of Beaufort High School during the time of the incidents alleged in Smith's complaint.

[2] Cottrill was the Assistant Principal for special needs at Beaufort High School during the time of the alleged incidents giving rise to this action.  He headed the special needs education program at Beaufort High School and was the plaintiff's direct supervisor.

On August 8, 2002, Smith was hired by the Beaufort County School District as a special education teacher for Trainable Mentally Disturbed ("TMD") students.[3]  In May of 2003, Smith informed Cottrill about several problems that she was having with staff and teachers in the Special Education Department.  The plaintiff alleges that on May 27, 2003, Cottrill sent the plaintiff a memorandum, which stated that the plaintiff's claims were unfounded.  The plaintiff asserts that the problems she reported to Cottrill continued and were not addressed.  The defendants claim that they addressed each of the plaintiff's complaints after they were received.

On July 23, 2003, the plaintiff sent a memorandum to Cottrill requesting a second teaching assistant to assist in the teaching and care of her students.  In July of 2003, Cottrill met with the plaintiff to discuss the TMD class and the plaintiff's assistant, Hattie Green ("Green").  On July 25, 2003, Cottrill informed the plaintiff that one assistant was sufficient to meet the class goals.  On September 12, 2003, the plaintiff relayed more of her concerns to Cottrill.  Cottrill responded to the plaintiff in a lengthy memo.  In the memo, he informed the plaintiff that her concerns had been noted and taken seriously.  On September 17, 2003, the plaintiff wrote a letter to Cottrill and complained about Alice Tchou's[4] treatment of a student.  In that letter, the plaintiff again requested an additional assistant in order to properly teach and care for her students.  On December 10, 2003, the plaintiff complained to Cottrill about her teaching assistant, Green.  On December 10, 2003, Cottrill sent an email to the Special Education Department urging the staff to get along better.  On December 12, 2003, Cottrill met with Green

---

[3] Smith has a Master's degree in Special Education and is certified to teach TMD classes in South Carolina.

[4] Alice Tchou ("Tchou") taught severely disabled students.

to discuss the issues that the plaintiff had with her performance. On December 19, 2003, the plaintiff received an email from Cottrill asking the plaintiff for documentation to support her complaints about Green. Cottrill informed the plaintiff that Green had not been aware of any performance issues and directed the plaintiff to discuss those issues with Green.

On August 20, 2004, the plaintiff sent an email to Cynthia Hayes ("Hayes") regarding a conversation between the plaintiff and Durbin. In the email, the plaintiff alleges that Durbin was extremely disrespectful to her during their conversation and mentioned that unless Durbin apologized to her, she would file a grievance. In response to the plaintiff's email, Hayes told the plaintiff to talk to Human Resources. On August 25, 2004, the plaintiff filed the first of two formal grievances with the Beaufort County School Board (the "Board"). The plaintiff's first grievance was filed in response to a memorandum that one of the plaintiff's supervisors, Dr. Walter Hawk, II ("Dr. Hawk"), wanted to place in her personnel file. The plaintiff believed that Dr. Hawk's memo was insinuating that the plaintiff removed information regarding a former student from that student's file. In response to the plaintiff's first grievance, the District scheduled a meeting for August 26, 2004. Before the meeting, the plaintiff discovered that the memorandum at issue had not been placed in her personnel file and informed the District that she did not want to go forward with the grievance. The District believed the issue to be resolved.

Later, however, the plaintiff complained to Cottrill that a letter that implicated her in wrongdoing had been made part of her record, that she filed a grievance to have the memorandum removed from her personnel file, and that she had not received any response from Dr. Hawk regarding the substance of those complaints. On September 9, 2004, the plaintiff asked Cottrill for an update on the grievance. On September 10, 2004, the plaintiff sent Cottrill

an email to address the District's policy regarding grievances and asked that the grievance move forward as outlined in that policy.

On November 12, 2004, the plaintiff emailed Cottrill regarding additional problems with her teaching assistant, Green.  On November 13, 2004, the plaintiff met with Cottrill to discuss the problems that she was having with Green.  On December 14, 2004, the plaintiff told Cottrill and Mona Lise Dickson, the Dean of Academics, about her issues with Keith Alston ("Alston"), Tchou's assistant.  The plaintiff thought that Alston had an inappropriate relationship with one of her students, Bruce.  The plaintiff complained that Alston was disrespectful towards her in front of her students and other teachers.  On January 5, 2005, Durbin informed the plaintiff by letter that Alston filed a job harassment complaint against the plaintiff after the plaintiff's husband threatened Alston at his home following a verbal argument.  The letter informed the plaintiff that the complaint had been forwarded to the District's personnel office and instructed the plaintiff not to have direct or indirect contract with Alston.  On January 7, 2005, the plaintiff reviewed her personnel file but did not see any reference to Alston's job harassment complaint.  On January 10, 2005, Cottrill informed the plaintiff by email that Alston had been told not to have direct or indirect contact with the plaintiff or her students.

On January 10, 2005, the plaintiff met with Otis Smith, the District's Assistant Superintendent of Human Resources to discuss the following issues: (1) Durbin's January 5, 2005 letter to the plaintiff stating that Alston filed a job harassment complaint against the plaintiff; (2) the confrontations between the plaintiff and Alston; (3) the mistreatment of the plaintiff by the administrators and staff at Beaufort High School; (4) the plaintiff's concerns that her conflicts with the administrators and staff at Beaufort High School would have a negative

effect on the plaintiff's daughter, a student at the school; (5) the plaintiff's request for information from the Beaufort Police Department's files and from Officer Richardson's files; and (6) Beaufort High School's lack of appreciation for the plaintiff despite her excellent evaluations and participation in the school. After the meeting, Otis Smith wrote a letter to the plaintiff summarizing the issues discussed in the meeting.

On January 18, 2005, the plaintiff emailed Otis Smith with a list of specific concerns that she wanted him to address as soon as possible. Those concerns were: (1) that the plaintiff's husband could not enter Beaufort High School's campus where their daughter attended school; (2) that the plaintiff wanted a copy of the job harassment complaint filed against her by Alston; and (3) that the plaintiff wanted a copy of the original grievance she filed against Beaufort High School on August, 25 2004. On January 18, 2005, Otis Smith wrote the plaintiff a letter informing her that his office never received a copy of the grievance she filed on August 25, 2004. Otis Smith also attached to his letter a copy of the January 5, 2005 letter from Alston, wherein Alston describes the plaintiff's behavior towards him as harassment.

Because the plaintiff's conflicts with coworkers continued, on January 31, 2005, Cottrill sent a letter to the plaintiff informing her that these conflicts were not acceptable.[5] Cottrill notified the plaintiff that her failure to improve her working relationships would result in the recommendation that her employment contract not be renewed for the following school year. On January 31, 2005, the plaintiff emailed Otis Smith regarding a request that the plaintiff meet to

---

[5] The plaintiff admits to having difficulties with the following administrators and teaching assistants at Beaufort High School: (1) Alice Tchou, (2) Hilary Savarese, (3) Herman Glaze, (4) Walter Hawk, (5) Mona Lise Dickson, (6) Rose Heyward, (7) Keith Alston, (8) Hattie Green, and (9) Ms. Seabrook.

answer questions concerning Alston's complaint.  The plaintiff told Otis Smith that she was

having problems understanding Alston's complaint and wanted her attorney to be present at the

meeting.

On February 1, 2005, the plaintiff requested Tchou to limit her visits to the plaintiff's

classroom to once a day because it disturbed her student's productivity and progress.[6]  On

February 2, 2005, Cottrill, the plaintiff, and Mona Lise Dickson met to discuss Cottrill's

concerns with the plaintiff.  Cottrill told the plaintiff that her failure to successfully work in

collaboration with others was interfering with her teaching duties and the successful

implementation of the students' Individual Education Plans ("IEPs").  Cottrill informed the

plaintiff that he would conduct monthly reviews of the plaintiff's performance for the remainder

of the school year.  Cottrill alleges that the plaintiff denied responsibility for any of the personnel

conflicts and refused to participate in any conversation regarding the issues raised.  The plaintiff

claims that she was bullied, humiliated, and threatened by Cottrill and Mona Lise Dickson.

At the conclusion of the meeting, Cottrill attempted to deliver a written letter detailing

the District's concerns with her performance, but the plaintiff refused to accept it.  Mona Lise

Dickson advised the plaintiff that refusing to accept the letter would be considered

insubordination.  The plaintiff accepted the letter and said that she felt faint and was having chest

pains.  After EMS checked the plaintiff's blood pressure and found that it was normal, the

plaintiff said she was fine, refused any further treatment, and walked out of the office.  The

plaintiff alleges that she was advised to go home.  The plaintiff's room was locked, so she

---

[6] The Special Needs Department's washing machine was located in the plaintiff's
classroom.  Tchou would come into the plaintiff's classroom to do laundry.

walked through Tchou's room.  The plaintiff alleges that Tchou kicked the plaintiff and her students out of her class and made nasty statements to the plaintiff.  The plaintiff reported this incident to Cottrill.

On February 3, 2005, Cottrill emailed the Special Needs Department and instructed the teachers and assistants to develop a plan to share the washing machine and to provide him with a copy of that plan or schedule.  On February 3, 2005, the plaintiff filed her second grievance, alleging that she was bullied, humiliated, and threatened by Cottrill and Mona Lise Dickson during their February 2, 2005 meeting.

On February 4, 2005, Cottrill stopped at the plaintiff's classroom at 7:15 a.m., and Tchou was taking care of the plaintiff's students because no one had been available to get the plaintiff's students off of the bus.  Cottrill reminded the plaintiff by email that all teachers were expected to be at school by 7:15 a.m.  The plaintiff replied by email stating that her assistant, Green, was to arrive at 7:15 a.m.  The plaintiff explained that she took her teacher preparation time in the mornings between 7:30 and 7:45 a.m.  Cottrill responded by telling the plaintiff that she was expected to be at school by 7:15 a.m.  The plaintiff responded by telling Cottrill that he was saying that she could no longer have her prep period in the morning and asked to be assigned a prep period so that she would not have to change it again.

On February 8, 2005, following several emails between Cottrill and the plaintiff, Cottrill wrote:

> This is my last email regarding these complaints.  I hear your complaints.  My suggestion is that if you're unhappy at Beaufort High School, you should look for another place to teach.  My expectations are the same for ALL teachers.  Regardless of age, gender, sexual preference, or race.  You can talk with any employee in this district.  Come to work, Do your job and work

with others.  If you cannot do these things then this may not be the place for you.  I am growing weary of the constant accusations and the constant twisting of the truth.  The environment that is being created has made it impossible for our students to be successful.  Think if we were able to take all this useless energy and work together.

. . .

As many times as I have investigated Ms. Tchou and your accusations, I have never found any evidence that warrants she has mistreated any of your students.  As a matter of fact, Ms. Tchou and Ms. Heyward have helped with your students on numerous occasions when you have been absent.

I do not care when you take your planning.  Make sure that your students are supervised appropriately and that you are actually planning during that time.[7]

On February 8, 2005, the plaintiff met with Otis Smith and Robyn Decker, the Human Resources Manager, to discuss the plaintiff's two grievances that were filed on August 25, 2004 and February 3, 2005.  Otis Smith told the plaintiff that he needed to know the administrative procedure, rules, and regulations that the plaintiff thought had been violated, misapplied, or misinterpreted.  The plaintiff promised to provide Otis Smith with that information on February 9, 2005.  Otis Smith informed the plaintiff that he would not forward or process the grievances until the plaintiff provided that information.  Otis Smith told the plaintiff that once he received the information from her, he would forward the grievances to Durbin, who would then set up a meeting, hear her grievances, and respond to her in writing.

On February 11, 2005, the plaintiff met with Otis Smith and Ruby Stradford Johnson

---

[7] Plaintiff's Exhibit 3, attached to Plaintiff's motion for summary judgment at Bates Stamp # 45 (subsequent references to Plaintiff's exhibits will be noted in an abbreviated fashion as "Exhibit __ , Bates __.").

("Johnson").  The plaintiff was informed that her specific complaints as well as the letter that
Cottrill had written were located in the Human Resources Office.  The plaintiff went to the
Human Resources Office to obtain the complaints and the letter, but could not locate those items.
The plaintiff told Human Resources that she wanted to set up another meeting with Cottrill to
discuss the content of her complaints regarding student safety, protocols for IEP's, and ethical
and legal protocols for the use of a handicapped bathroom, which non-handicapped students
were using.

On February 12, 2005, the plaintiff emailed Otis Smith and Johnson regarding the
meeting on February 11, 2005.  The plaintiff informed them that the same student that she
reported to the administration for being tied to the door of Tchou's classroom was still being tied
to the door.  The plaintiff also informed Otis Smith and Johnson that Alston brought in a large
turkey fryer at Christmas time and placed it in a high traffic area near the student who was tied to
the door.

On February 14, 2005, Cottrill asked the plaintiff to meet with him and Johnson the next
day.  In response, the plaintiff stated that she would not meet with Cottrill until he "defined the
behavior that you feel needs changing or until I have copies of both corrective actions and the
file that supports your report."[8]  On February 15, 2005, Cottrill sent the plaintiff a letter to follow
up on both the February 2, 2005 conference and his January 31, 2005 letter.  In the letter, Cottrill
stated:

> My initial judgment was that I would monitor your progress on a
> monthly basis.  However, your behavior over the last week
> indicates that you are continuing to engage in behavior, which

---

[8] Exhibit 3, Bates 42.

> adversely affects our ability to serve our students.  Therefore, I am
> going to monitor your progress on a weekly basis.
>
> As you may recall, on February 2, 2005, you indicated that Ms.
> Alice Tchou had mistreated you and your students by throwing all
> of you out of her room.  You also indicated that Ms. Alice Tchou
> said some nasty things to you.  However, after taking statements
> from witnesses, I found no indication that your report was valid.[9]

On February 21, 2005, the plaintiff emailed Otis Smith and requested to review the materials in his possession relating to her.  The plaintiff insisted that she was unable to respond to her supervisor or to defend herself without reviewing those materials.  The plaintiff inquired about whether a determination had been made regarding Alston's job harassment charge against her and asked to view a statement given by Robyn Decker regarding that matter.  In response, Otis Smith emailed and sent a letter to the plaintiff stating that she had been given access to her personnel file and reviewed it a number of times.  Otis Smith refused to give the plaintiff the information that he collected in his investigations and informed her that the investigation into Alston's job harassment claim against her was ongoing.

On February 25, 2005, Cottrill held a meeting with the plaintiff, Tchou, and Hillary Savarese ("Savarese") in an attempt to facilitate communication and cooperation between the plaintiff and Tchou and to discuss ways that the plaintiff's TMD classroom could collaborate and communicate with Tchou's Severe and Profoundly Disabled class.[10]  The plaintiff and Tchou were instructed to plan together during the week.  Cottrill set up another meeting with the plaintiff and Tchou for March 4, 2005.  After the meeting, Cottrill memorialized the February

---

[9] Exhibit 3, Bates 41.

[10] They discussed the laundry issue, created a schedule for the use of the washing machine, and created a plan for when a particular child would be picked up for lunch.

25, 2005 meeting in a letter and reminded the plaintiff about the March 4, 2005 meeting.  The plaintiff failed to attend the March 4, 2005 meeting.

On March 7, 2005, the plaintiff emailed Otis Smith and copied Durbin on the email.  In the email, the plaintiff stated that she wanted to move forward with her grievance.  She asked about the progress made in resolving Alton's job harassment complaint against her.  On March 9, 2005, the plaintiff asked to view her personnel file.  On March 17, 2005, the plaintiff attended a meeting with Cottrill and Savarese to discuss planning procedures and the plaintiff's concerns with her teaching assistant, Green.  Cottrill scheduled the next meeting with the plaintiff on March 22, 2005.  On March 22, 2005, the plaintiff did not attend the meeting or notify anyone that she would be absent.

On April 12, 2005, Cottrill sent a certified letter to the plaintiff's home to provide her with formal notice that he was recommending that her employment with the District not be continued beyond the conclusion of the 2004 - 2005 school year.  In the letter, Cottrill stated:

>As you may recall, over the last year, you have had several conflicts with other faculty and staff members who also serve our special education students.  Your pattern of continuous conflicts with others caused me to write you on January 31, 2005, explaining the problem, offering assistance with correcting the problem, asking that you meet with me on a periodic basis to discuss your progress, and warning that failure to improve may result in a termination recommendation.
>
>After reviewing your behavior over the last few months, I do not believe that you wanted to improve your working relationships with others.  You continue to resist meeting with me as your assistant principal, and you continue to have conflicts with other employees.  Your behavior in this regard, severely hampers your effectiveness as a special education teacher at Beaufort High School.
>
>As explained during our numerous conferences, our special

> education students require a team approach for service. Each
> member of the team must be willing to work well with other
> members for the good of each student. You have strongly resisted
> our efforts in this regard, and therefore, we believe that the
> termination of your employment is appropriate under the
> circumstances. While we regret this action is necessary, we
> believe it is in the best interest of our students.[11]

On April 12, 2005, based on Cottrill's assessment of the plaintiff, Durbin recommended

that the plaintiff's employment contract not be renewed for the 2005 - 2006 school year due to a

pattern of continuous conflicts with other faculty and staff in the Special Education Department.

On April 12, 2005, the Beaufort County School Board voted not to renew the plaintiff's contract

for the 2005 - 2006 school year.

On April 13, 2005, Gaither sent a certified letter to the plaintiff to advise her that the

Board had voted at its regular meeting on April 12, 2005 to accept the recommendation that the

plaintiff's employment with the District not be continued beyond the conclusion of the 2004 -

2005 school year. In his letter, Gaither stated:

> The decision is based on your continuous conflicts with other
> employees, which interfere with Beaufort High School's ability to
> serve all of its special education students. By letter dated January
> 31, 2005, [Cottrill], your Assistant Principal, advised you of
> concerns and explained the possible consequences if you failed to
> show improvement. Not only did your performance not improve,
> but you resisted meeting with Mr. Cottrill to discuss ways in which
> you could improve. Your repeated conflicts with others and your
> willful refusal to follow the directives of your supervisors, justifies
> the non-renewal of your employment under the provisions of S.C.
> Code Ann. §§ 59-25-430 and 440.
>
> Under S.C. Code Ann. § 59-29-470, you have a right to a hearing
> before the Beaufort County Board of Education, provided you
> make a written request for the hearing within fifteen (15) days of

---

[11] Exhibit 3, Bates 35.

your receipt of this letter . . . .[12]

On April 14, 2005, pursuant to the plaintiff's rights under S.C. Code § 59-25-470, the plaintiff emailed Gaither to request a hearing before the Board.  She also requested a meeting with Gaither to discuss the lack of information available to her in her personnel file.  The plaintiff stated that on February 21, 2005, when she reviewed her personnel file, it did not contain anything that could lead to dismissal.  The plaintiff told Gaither that she could not respond to the allegations until she knew what they were based on and that Otis Smith informed her by letter dated March 31, 2005 that her personnel file did not contain any derogatory information.  The plaintiff asked Gaither to withdraw his request for her dismissal.  On May 5, 2005, the plaintiff filed a complaint with the South Carolina Human Affairs Commission.

Before the plaintiff's hearing in front of the Board, the Board withdrew its prior decision to not renew the plaintiff's employment.[13]  On June 8, 2005, Gaither wrote a letter to the plaintiff on behalf of the District and offered the plaintiff an employment contract for the 2005 - 2006 school year.  In the letter, the District expressed its concern regarding the plaintiff's conflicts with coworkers and explained that the plaintiff's new supervisor would provide her with an improvement plan.  The letter notified the plaintiff that the failure to sign and deliver the enclosed contract to the District's office by June 21, 2005 would constitute a rejection of the District's employment offer.  The plaintiff failed to sign and return the offered contract by the required date, thereby rejecting the District's employment offer for the 2005 - 2006 school year.

---

[12] Exhibit 2, Bates 32.

[13]  On June 9, 2005, the Board's attorney wrote the plaintiff to inform her that the contract non-renewal hearing had been cancelled.

On August 1, 2005, the plaintiff filed a discrimination charge with the EEOC alleging discriminatory conditions within the District, including discrimination against the plaintiff and the special education students.[14]

On December 15, 2005, this action was originally filed in the Beaufort County Court of Common Pleas.  On January 17, 2006, the defendants timely removed the action to this Court. On February 13, 2006, each of the defendants responded to the plaintiff's complaint.  On June 15, 2007, the defendants moved for summary judgment as to all of the plaintiff's claims.  On July 20, 2007, Smith responded in opposition to the defendants' motion for summary judgment. On January 23, 2008, Magistrate Judge George C. Kosko ("Magistrate Judge Kosko") issued a report analyzing the issues and recommending that the defendants' motion for summary judgment be granted.  On February 4, 2008, the plaintiff made a timely objection to the report and recommendation, pursuant to 28 U.S.C. § 636(b)(1).

This Court is charged with making a *de novo* determination of any portions of the magistrate judge's recommendation to which specific objection is made.  *See* 28 U.S.C. § 636(b). The Court evaluates the evidence without granting any deference to the magistrate judge's findings and conclusions.  Matthews v. Weber, 423 U.S. 261, 270-71 (1976).  The final decision is made by the Court based upon the actual record, not merely the magistrate judge's reported findings.  Wimmer v. Cook, 774 F.2d 68, 76 (4th Cir. 1985).  The Court may accept, reject, or modify, in whole or in part, the report and recommendation, or recommit the matter with instructions.  *See* 28 U.S.C. § 636(b)(1).

II.    Standard for Deciding a Motion for Summary Judgment

---

[14]  The EEOC issued a right to sue letter on March 30, 2006.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  Summary judgment is proper only where the moving party is entitled to judgment as a matter of law, where it is clear what the truth is, and where no genuine issue remains for trial.  Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464 (1962).

III.    Plaintiff's Objections

The plaintiff's objections to Magistrate Judge Kosko's report and recommendation are as follows: (1) the plaintiff's complaints were not made pursuant to her duties as a teacher and are protected by the First Amendment; (2) the defendant's interest in providing educational services to special needs students does not outweigh any interest the plaintiff has in making the subject complaints; (3) the plaintiff does not fail to allege actionable retaliatory conduct of the individual defendants; and (4) Gaither, Durbin, and Cottrill are not entitled to qualified immunity.  These objections are each discussed in turn below.

A.    First Amendment

The plaintiff's first three objections to the report and recommendation relate to the allegation that her discharge from employment was based on an exercise of conduct protected by the First Amendment.  "[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."  Rankin v. McPherson, 483 U.S. 378, 383 (1987).  In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the McVey v. Stacy three prong test:

(1) that the public employee must have spoken as a citizen, not as an employee, on a matter of public concern, (2) that the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public, and (3) that there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.  Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 316 (4th Cir. 2006); McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998).

1.     Speaking as a Private Citizen on a Matter of Public Concern

The plaintiff asserts that her complaints to the administration at Beaufort County High School were not made pursuant to her duties as a teacher and are protected under the First Amendment.  The plaintiff alleges that her complaints about the mistreatment of students, the failure of the District to maintain records, and the failure of the district to properly provide the equipment and staff to care for and to teach the children were issues of public concern. Furthermore, the plaintiff claims that she acted beyond her duties as a teacher and was acting as a citizen.

Under the first prong of the McVey test, the Court must assess whether the plaintiff's speech was as a private citizen on a matter of public concern.  "Personal grievances, complaints, and criticism are examples of speech which do not address matters of public concern, and are not protected by the First Amendment."  Hall v. Marion School District No. 2, 860 F.Supp. 278, 287 (D.S.C. 1983).  Furthermore, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  Garcetti v. Ceballos, 547 U.S. 410, 420 (2006).  "Whether speech fairly relates to a public concern or expresses a private grievance or a matter of immediate self-interest must be determined by the

content, the form, and the context of the speech." <u>Stroman v. Colleton County Sch. Dist.</u>, 981

F.2d 152, 156 (4th Cir. 1992).

According to the plaintiff, she engaged in constitutionally protected speech by making

the following complaints to her superiors at Beaufort High School:

        a.  A special education child was tethered to a door;

        b.  The plaintiff's assistants failed to perform their job duties;

        c.  A turkey fryer was placed near a doorway to her classroom;

        d.  African-American students in the learning disabled program received disparate treatment;

        e.  A student was forced out of the program despite failing to meet graduation requirements;

        f.  The school allowed former students to visit and commingle with special needs students;

        g.  The administration mismanaged an investigation of allegations against a special education student;

        h.  The school failed to update student files;

        i.  Restrooms were not properly maintained;

        j.  The school failed to address the medical needs of a physically handicapped child; and

        k.  The school failed to provide proper speech services to students.[15]

In this case, the plaintiff's speech did not address matters of public concern.  The plaintiff spoke

as an employee pursuant to her role as a teacher and complained about her coworkers, working

---

[15] Complaint, paragraphs 9 - 11.

environment, and the alleged mistreatment of students.  Under S.C. Code § 20-7-510,[16] it is a

part of the plaintiff's duties as a teacher to report her concerns to the administration.  All of the

plaintiff's complaints were made to the administration of Beaufort High School, and the District

responded to each of the plaintiff's allegations.[17]  "[W]hen public employees make statements

---

[16] Section 20-7-510 provides that "[a] . . . school teacher . . . must report . . . when in the person's professional capacity the person has received information which gives the person reason to believe that a child has been abused or neglected . . . ."

[17] Regarding the complaints referenced in the plaintiff's complaint, the District responded as follows:

a.  The student tethered to a doorway suffers from extreme physical and mental deficiencies and posed an extreme risk of harm to himself and others due to his special needs. Tethering the child was included in the student's individual education plan and was done with the parent's knowledge and permission.

b.  The District observed the plaintiff's classroom and attempted to mediate between the plaintiff and her assistants, encouraging the plaintiff to provide assistants with clear, written expectations of their performance.

c.  The turkey fryer was not in use and no student desks were located near it. Furthermore, the plaintiff's classroom had other doorways which offered unencumbered access to her classroom.

d.  The plaintiff did not complain to the District that African-American students in the special education program received disparate treatment.  She made this claim in her EEOC complaint, which was filed after she declined the position offered for the 2005 - 2006 school year.

e.  The plaintiff complained to the administration regarding the treatment of a regular student.  The plaintiff believed that the student was being inappropriately forced out of the school despite not having completed the courses necessary for graduation.  The administration informed the plaintiff that the student was not allowed on school property due to a pending criminal investigations and allegations of sexual assault.

f.  The plaintiff complained about the school's visitation policy being unclear after the district instructed her not to permit a particular former student to visit her classroom due to allegations that he sexually assaulted another student while enrolled at Beaufort High School.

pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).   Many of the plaintiff's complaints were made pursuant to her duties as a teacher.  The plaintiff's remaining allegations are considered personal grievances, complaints, and criticisms, which are not protected by the First Amendment.

    2.   Defendant's Interest Outweighs the Plaintiff's Interest

  The plaintiff alleges that the defendant's interest in providing educational services to special needs students does not outweigh any interest the plaintiff has in making the subject complaints.  The plaintiff refers to the balancing test set forth in Pickering v. Board of Education, 391 U.S. 563, 568 (1968).[18]  The plaintiff argues that her reports and actions did not

---

  g.  The plaintiff complained about the District's maintenance of files in response to the accusation that she removed materials from a student's files.  In response, the District moved the former student's files to a locket filing cabinet.

  h.  The plaintiff complained that another special education teacher improperly disposed of soiled diapers.  The District found that the diapers had been placed in a trash can and encouraged the plaintiff to discuss these issues with the other teacher.

  j.  The District is not aware of any complaints made by the plaintiff concerning the medical needs of students other than one incident where the plaintiff argued with a physical therapist regarding the use of a piece of medical/therapeutic equipment, a gait trainer, to assist with one of her students.

  k.  The District is not aware of any complaints of the plaintiff regarding speech services for students.

  [18]  The Supreme Court explained in Pickering that the Court must arrive at a balance between the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.  391 U.S. 563, 568 (1968).

interfere with the operation of Beaufort High School and that if those reports had been taken seriously, they would have improved the operation of the school. Furthermore, the plaintiff alleges that her disruptions to the school were related to the staff's failure to maintain a hazardous free environment for the students in their care.

Under the McVey test's second prong, the Court must look to whatever public interest may be contained in the subject speech and weigh it against the state's dual interest as a provider of public service and employer of persons hired to provide that service. In this case, the Court must look to the plaintiff's interest in making the complaints about Beaufort High School and weigh those against the operation of Beaufort High School and the education of the special needs students. Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to the coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed. Ridpath, 447 F.3d at 317.

In order for the Special Education Department to function efficiently, the teachers were encouraged to operate as a team. Each student had an individual education goal and plan, which was constructed through the collaboration of the teachers, parents, and administrators. The goal of the individual education plans was to provide the proper educational services to each student in the least restrictive environment appropriate for the student's needs. The individual education plans frequently required the students to be transferred between the two levels of special

education classes and into regular classes at various intervals during the day.  Because of these

transfers, it is imperative that the special education teachers and assistants work together to

coordinate the schedules to properly transfer the students and to provide continuous instruction.

It is also important for the teachers to communicate and to share the resources and equipment to

ensure the maximum benefit to the students.

As a result of the plaintiff's continuous complaints regarding personnel difficulties and

her coworker's teaching methods, the education of Beaufort High School's special needs

students suffered.  The plaintiff interrupted other special education classrooms, refused to accept

students from and return students to the proper class, failed to keep proper attendance records,

failed to attend a mandatory individual education program meeting, refused to attend planning

meetings with Tchou, and failed to ensure that her students were properly supervised.  Based on

the factors set forth in Ridpath, the District's interest in providing educational services to special

needs students outweighs any interest the plaintiff has in complaining about her coworkers,

challenging others' teaching methods, or filing grievances related to problems with her superiors.

### 3.    Plaintiff Fails to Allege Actionable Retaliatory Conduct

The plaintiff alleges that she does not fail to allege retaliatory conduct against Gaither,

Durbin, and Cottrill.  The plaintiff states that Cottrill took actions against her by making

recommendations to the school board, harassing her, failing to adequately investigate her

complaints, informing the plaintiff that her complaints were unfounded, and threatening

disciplinary action.  The plaintiff claims that Gaither retaliated against her by supporting the

actions of Cottrill and by making his own recommendations to the Board.  The plaintiff alleges

that Durbin retaliated against her by supporting Cottrill and by making decisions to discipline the

plaintiff.

Under the third prong of the McVey test, the plaintiff must demonstrate a causal relationship between her protected speech and the termination of her teaching duties. In retaliation claims, a public employer violates an employee's First Amendment rights when it discharges, refuses to rehire, or makes decisions relating to the promotion, transfer, recall, and hiring based on the exercise of the employee's free speech rights. Ridpath, 447 F.3d at 316. Criticism, false accusations, verbal reprimands and the like are not actionable retaliatory acts. See Suarez Corp. Industries v. McGraw, 202 F.3d 676, 686 (2000).

During the course of the plaintiff's employment with Beaufort High School and in addition to the complaints set forth in her complaint, the plaintiff made numerous complaints regarding personal difficulties with various co-workers.[19] The District adequately investigated each of the plaintiff's personnel complaints and found that they involved personality conflicts or personal issues that did not relate to the education of students. Furthermore, none of the plaintiff's complaints resulted in a finding of misconduct. Gaither and Cottrill, as Superintendent and Assistant Principal, respectively, were acting well within their duties by making recommendations to the Board and did not retaliate against the plaintiff by doing so. Furthermore, Durbin's decision to support Cottrill recommendations is not retaliatory conduct. In this case, the plaintiff fails to allege retaliatory conduct by any of the individual defendants.

---

[19] During the plaintiff's employment, a number of employees complained about her conduct, claiming that she was confrontational and disrespectful to them. Tchou became so frustrated with the plaintiff's constant accusations against her that she kept a handwritten notebook documenting her contact with the plaintiff. Hattie Green threatened to quit her teaching assistant position because of constant conflicts with the plaintiff. As previously mentioned, Keith Alston filed a formal harassment complaint against the plaintiff.

B.     Gaither, Durbin, and Cottrill are Entitled to Qualified Immunity

The plaintiff alleges that Gaither, Durbin, and Cottrill are not entitled to qualified immunity. "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (2006) (*quoting* Wilson v. Layne, 526 U.S. 603, 609 (1999)). Accordingly, "all but the plainly incompetent or those who knowingly violate the law" are protected. Malley v. Briggs, 475 U.S. 335, 341 (1986). "Reliance on the objective reasonableness of an official's conduct is measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In order to determine whether an individual defendant is entitled to qualified immunity, the Court will follow the two-step sequential analysis as set forth in Saucier v. Katz. 533 U.S. 194, 200 (2001). The first step is to determine "whether a constitutional right would have been violated on the facts alleged." Id. If the facts, viewed in a light most favorable to the plaintiff, do not establish a constitutional violation, the inquiry ends, and the plaintiff cannot prevail. Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004). However, if "the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Bailey v. Kennedy, 249 F.3d 731, 739 (4th Cir. 2003).

As previously discussed, the plaintiff's speech, in which she made numerous complaints

that focused on personnel issues and personality conflicts, was made pursuant to her duties as a teacher and was not protected by the First Amendment.  Therefore, because no constitutional violation occurred, as required by the first inquiry as set forth in <u>Saucier</u>, the plaintiff cannot prevail.  Even if the plaintiff could establish a constitutional violation, she cannot identify a single action of any defendant that violates a clearly established constitutional right.  Therefore, the Court concludes that the defendants Gaither, Durbin, and Cottrill are entitled to qualified immunity on the plaintiff's First Amendment claims.

IV.    Conclusion

Accordingly, the Court finds that Magistrate Judge Kosko's recommendation is appropriate.  For the reasons stated above, the Court hereby grants the defendants' motion for summary judgment.

**AND IT IS SO ORDERED.**

_____
**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

March 25, 2008
Charleston, South Carolina